## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SERGEANTS BENEVOLENT ASSOCIATION HEALTH & WELFARE FUND, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ENDO INTERNATIONAL PLC, ENDO PHARMACEUTICALS INC., PAR PHARMACEUTICAL, INC., QUALITEST PHARMACEUTICALS, INC., MYLAN INC., MYLAN PHARMACEUTICALS INC. SANDOZ, INC., AND ACCORD HEALTHCARE, INC. <br><br> Defendants. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Sergeants Benevolent Association Health & Welfare Fund, on behalf of itself and all others similarly situated, files this Class Action Complaint against Defendants Endo International PLC, Endo Pharmaceuticals Inc., Par Pharmaceutical, Inc., Qualitest Pharmaceuticals, Inc., Mylan Inc., Mylan Pharmaceuticals Inc., Sandoz, Inc., and Accord Healthcare, Inc. and alleges as follows:

## I.    NATURE OF THE ACTION

1.     This is a civil antitrust action on behalf of proposed classes of end-payors who indirectly purchased, reimbursed, or otherwise paid for amitriptyline hydrochloride from June 3, 2014 to the present (the "Class Period").  The case arises out of an anticompetitive conspiracy among Defendants to raise and fix the prices of generic amitriptyline, a tricyclic antidepressant sold in tablet form.

2.    Recognized as an "Essential Medicine" by the World Health Organization, amitriptyline is prescribed to treat symptoms of depression as well as chronic pain from migraine headaches and other medical syndromes.  Amitriptyline is a well-established medication that was first approved for patient use in 1961.  Generic versions of amitriptyline have been available in the United States since the 1970s.

3.    Following generic pharmaceutical trade association meetings in February and June 2014 attended by representatives of Par, Mylan, Sandoz, Endo, Qualitest, and Accord, Defendants drastically raised the price of generic amitriptyline.[1]  These price hikes occurred in tandem and were the result of a horizontal agreement among Defendants to increase and maintain generic amitriptyline prices.

4.    Beginning in July 2014—shortly after a meeting attended by representatives of Par, Mylan, Sandoz, Qualitest, and Accord—Defendants implemented dramatic price increases for their amitriptyline products.  The average price of generic amitriptyline increased by an average of nearly 1,500% between July and August 2014.  Prices remain at supracompetitive levels today—amitriptyline costs approximately 1,200% more than before the June 2014 generic pharmaceutical trade association meeting.

5.    Defendants' extraordinary price increases were coordinated.  These increases were neither the product of a competitive market, nor made necessary by any apparent increased manufacturing costs.  And because generic pharmaceutical manufacturers do not incur the research and development costs that brand manufacturers invest to develop new prescription drugs, Defendants' price increases cannot be attributed to the need to fund research and

---

[1] Amitriptyline, like most pharmaceutical products, is sold in various dosages, *e.g.*, 10 mg, 25 mg, 50 mg, 75 mg, 100 mg, and 150 mg tablets.  Unless otherwise stated, prices in this complaint refer to per-unit prices for all dosages.

development.  Defendants' price increases resulted from their conspiracy to restrain trade in the market for amitriptyline.

6.     The pricing practices of Defendants and other generic pharmaceutical manufacturers are currently the subject of intense regulatory scrutiny.  In October 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah E. Cummings launched an investigation into extraordinary price increases in the generic drug industry, specifically targeting the pricing practices of Defendants Endo and Mylan.  In February 2015, Senator Sanders and Representative Cummings requested that the U.S. Department of Health and Human Services' Office of Inspector General examine price increases for several generic prescription drugs, including the 100 mg and 150 mg dosages of generic amitriptyline, the prices of which, according to National Average Drug Acquisition Cost data maintained by the Center for Medicaid Services, had increased by 2,487% and 691%, respectively.

7.     To date, the DOJ has issued subpoenas to Defendant Mylan and to Defendant Endo's subsidiary, Par Pharmaceutical Holdings, in connection with its ongoing investigation of anticompetitive practices in the generic pharmaceutical industry.  In a regulatory filing with the SEC dated November 1, 2016, Endo disclosed that in December 2015, Endo Pharmaceuticals, Inc. "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including . . . Amitriptyline Hydrochloride."  In its 2015 annual report, Mylan similarly disclosed that in December 2015, it too received a subpoena and interrogatories from the Connecticut Office of the Attorney General "relating to the marketing, pricing and sale of certain of the Company's generic products . . . ."  These subpoenas follow a number of press reports and

inquiries from the United States Congress highlighting the rising prices of generic drugs, including amitriptyline in particular.

8.     Defendants' coordinated anticompetitive conduct was designed to and did raise, fix, maintain, or stabilize the price of generic amitriptyline.  As a result, Defendants violated sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and the various state antitrust and consumer protection laws enumerated below.  Plaintiff seeks damages and injunctive relief to prevent Defendants from continuing and maintaining the anticompetitive combination, conspiracy, or agreements set forth in this complaint.

## II.    <u>JURISDICTION AND VENUE</u>

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. sections 1331 and 1337 and 15 U.S.C. sections 1, 3, and 26.  This Court has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. sections 1332(d) and 1367, because this is a class action in which there are over 100 members of the proposed Classes (as defined herein); the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and at least one member of the proposed Classes is a citizen of a state different from that of one of the Defendants.

10.     Venue is proper in this court under 15 U.S.C. sections 15(a) and 22 and 28 U.S.C. section 1391 because Defendants transact business in this District and a substantial part of the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried on in part within this District.  The acts complained of have and will continue to have substantial effects in this District.

11.     This Court has personal jurisdiction over each Defendant because, among other things, each Defendant, directly or through its directors, officers, employees, representatives, agents, and/or affiliates: (a) transacted business throughout the United States, including in this

judicial district; (b) sold amitriptyline throughout the United States, including in this judicial district; (c) had substantial contacts with the United States, including in this judicial district; and (d) was engaged in an illegal scheme and conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### III.    PARTIES

#### A.    Plaintiff

12.    Plaintiff Sergeants Benevolent Association Health & Welfare Fund is located in New York and provides health and prescription drug benefits to active and retired New York City Police Department Sergeants and their dependents.  During the Class Period, as a third-party payor of pharmaceutical claims for its members, Sergeants has purchased generic amitriptyline and/or provided reimbursement for purchases of generic amitriptyline by its members, retirees, and their families in Arizona, California, Florida, Georgia, Hawaii, Illinois, Indiana, Kansas, Massachusetts, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio Pennsylvania, South Carolina, Texas, and Vermont, from one or more Defendants.  During the Class Period, Sergeants purchased, paid, and reimbursed for amitriptyline purchased in New York manufactured by each of Qualitest, Mylan, Sandoz, and Accord.  Sergeants has paid and/or provided reimbursement for amitriptyline purchases that have been made for personal and/or household use and have been at prices significantly higher than the prices of amitriptyline prior to June 3, 2014.  For the past several years, Sergeants has continually purchased and/or provided reimbursement for generic amitriptyline and will continue to do so.

#### B.    Defendants

13.    Defendant Endo International PLC is an Irish corporation with its principal place of business located in Dublin, Ireland.  Defendant Endo Pharmaceuticals Inc. is a Delaware

corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is a subsidiary of Endo International. During the Class Period, Endo sold amitriptyline through its subsidiaries Qualitest Pharmaceuticals, Inc. and Par Pharmaceutical Inc. in this District and throughout the United States.

14.    Defendant Qualitest Pharmaceuticals, Inc. is an Alabama corporation with its principal place of business in Huntsville, Alabama. In 2010, Endo International acquired Qualitest. During the Class Period, Qualitest marketed and sold amitriptyline in this District and throughout the United Sates.

15.    Defendant Par Pharmaceutical, Inc. is a Delaware corporation with its principal place of business in Woodcliff Lake, New Jersey. In September 2016, Endo International acquired Par. Endo then combined its Par and Qualitest business units, and renamed the combined business "Par Pharmaceutical, an Endo International Company." During the Class Period, Par marketed and sold amitriptyline in this District and throughout the United States.

16.    Defendants Endo International PLC, Endo Pharmaceuticals Inc., Qualitest, and Par are collectively referred to as Endo.

17.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania. Mylan is a subsidiary of Mylan N.V., a Netherlands corporation headquartered in Hartfordshire, U.K., and in Canonsburg, Pennsylvania. During the Class Period, Mylan Inc. marketed and sold amitriptyline in this District and throughout the United States through its subsidiary, Mylan Pharmaceuticals Inc.

18.    Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia 26505. During the Class Period,

Mylan Pharmaceuticals Inc. marketed and sold amitriptyline in this District and throughout the United States.

19.     Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to as Mylan.

20.     Defendant Sandoz, Inc. is a Colorado corporation with its principal place of business in Princeton, New Jersey.  During the Class Period, Sandoz marketed and sold amitriptyline in this District and throughout the United States.

21.     Defendant Accord Healthcare, Inc. is a North Carolina corporation with its principal place of business in Durham, North Carolina.  During the Class Period, Accord marketed and sold amitriptyline in this District and throughout the United States.

## IV.   CO-CONSPIRATORS AND AGENTS

22.     The anticompetitive and unlawful acts alleged against the Defendants in this complaint were authorized, ordered, or performed by Defendants and their respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' business or affairs.

23.     Various persons and/or firms not named as Defendants may have participated as co-conspirators in the violations alleged in this complaint and may have performed acts and made statements in furtherance of such violations.

24.     Each Defendant acted as the principal, agent or joint venturer of, or for, other Defendants with respect to the acts, violations, and course of conduct alleged in this complaint.

25.     The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged in this complaint were consensually formed between the Defendant principals and agents.  Defendants' agents acted in the United States and abroad within the scope of their agency relationship with their own principals.  Defendants'

agents acted under the explicit, implied, or apparent authority of their principals.  These acts include subsidiaries selling, distributing, or shipping amitriptyline at the request of their parent companies.  Further, Defendants acted on behalf of and were subject to the control of their principals, and they acted within the scope of authority or power delegated by their principals. Defendants' agents performed their duties within the scope of their agency, in selling, distributing, or shipping amitriptyline that was sold at supracompetitive prices.

26.    Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied, or apparent authority.

## V.    <u>INTERSTATE AND INTRASTATE COMMERCE</u>

27.    At all relevant times, Defendants, directly or through one or more of their respective parents, subsidiaries, business units, agents or affiliates, promoted, distributed, sold or delivered substantial amounts of amitriptyline in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

28.    At all relevant times, Defendants transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of amitriptyline.

29.    Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

30.    Amitriptyline manufactured abroad by the Defendants or their affiliates and sold in the United States constitutes domestic or import commerce.

31.     In furtherance of their efforts to restrain competition in the market for amitriptyline, Defendants employed the United States and interstate and international telephone lines, as well as means of interstate and/or international travel.  The activities of Defendants were within the flow of and have substantially affected interstate commerce.

32.     Defendants' anticompetitive conduct has had substantial intrastate effects in that, among other things, such conduct deprived retailers within each state of access to more affordable amitriptyline that they could sell to end-payors within each state.  Defendants' anticompetitive combination, conspiracy, or agreement to reduce competition in the market for amitriptyline has directly affected and disrupted commerce for end-payors within each state.

33.     During the relevant time period, amitriptyline was shipped into each state and was sold to or paid for by end-payors.  Defendants' conduct as alleged herein has had substantial effects on intrastate commerce in each state because amitriptyline was sold to consumers and third-party payors in each state and Defendants entered into an unlawful, anticompetitive agreement that affected commerce in each state.

## VI.     FACTUAL ALLEGATIONS

### A.     Background Regarding Generic Prescription Drugs

34.     Bringing a new drug to market is expensive and time consuming.  Accordingly, subject to certain conditions, pharmaceutical manufacturers that invest in research and development and successfully develop and bring to market a new drug are by law granted a period of exclusivity during which they can market and sell the new drug without the threat of competitors offering the same product at lower prices.  The exclusivity period is designed to promote a balance between new drug innovation and generic drug competition.

35.     Under the Federal Food, Drug, and Cosmetic Act, a manufacturer that creates a new drug product must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA").  An NDA must include specific data concerning safety and effectiveness, among other things.

36.     Once the FDA approves a brand manufacturer's NDA, the brand manufacturer may list the patents identified by the brand manufacturer in "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book."  In the United States it takes an average of over 10 years to bring a new drug to market.

37.     The process for bringing a generic drug to market, by contrast, is faster and cheaper.  The Hatch-Waxman Act of 1984 lowered the regulatory hurdles for prospective generic drug manufacturers by simplifying and streamlining the NDA process.  A generic manufacturer seeking approval to sell a generic version of a branded drug may instead file an abbreviated new drug application or "ANDA."  An ANDA may rely on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA.  The ANDA must show that the generic drug contains the same active ingredient(s), strength, dosage form, and route of administration as the brand drug, and that it is absorbed at the same rate and to the same extent as the brand drug.  Thus, an ANDA must show that the generic drug is therapeutically equivalent to the branded drug.  In addition, as part of the FDA's ANDA approval process, a generic manufacturer must certify that the generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book.

38.     Generic drugs that are therapeutically equivalent to corresponding branded drugs receive an "AB" rating from the FDA, allowing their substitution for the branded drug when an end-payor presents a prescription for the branded drug.

39.     Congress enacted the Hatch-Waxman Act to accelerate the market entry of generic competitors to reduce health care expenses across the country.  The expedited approval process and exclusivity periods established under Hatch-Waxman were designed to provide consumers with faster, cheaper access to bioequivalent generics while maintaining incentives to innovate in new drug development.

40.     Generic drug products provide the only form of direct economic and price competition for brand-name drugs.  Absent the ability of purchasers to choose a therapeutically equivalent AB-rated generic alternative, branded drugs face no competition and can therefore be priced at much higher levels.  In short, the presence of AB-rated generic drugs promotes a competitive market for essential prescription drugs.

41.     According to a report by the Generic Pharmaceutical Association ("GPhA"), nearly 3.8 billion (88%) of the total 4.3 billion prescriptions dispensed in the U.S. in 2014 were filled using generic drugs.

42.     Ordinarily, a generic medication enters the market at a price 10% to 25% below the brand-name price.  A mature generic market, such as the market for amitriptyline, includes several competing firms.  Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the primary difference among competing products and the primary basis for competition among firms. Therefore, over time, the price of the generic medication declines as other generic manufacturers enter the product market, until competitive pricing prevails.  Eventually, competition among manufacturers of a generic drug causes prices to approach manufacturers' marginal costs, resulting in significant savings to end-payors.

B.    **Amitriptyline Price Increases**

43.    Amitriptyline is the generic version of the brand-name drug Elavil, a tricyclic antidepressant approved by the U.S. Food and Drug Administration in 1961. Generic versions of amitriptyline have been available for purchase in the United States since 1976.

44.    Used primarily to treat depression and chronic pain, tricyclic antidepressants were among the earliest antidepressants developed. Tricyclic antidepressants ease depression by altering brain chemistry to increase levels of the neurotransmitters norepinephrine and serotonin, which are known to regulate mood.

45.    Amitriptyline is one of the most frequently prescribed tricyclic antidepressants in the United States.

46.    In February and June 2014, each of the Defendants attended at least one of two meetings of the GPhA—the February 19-21, 2014 Annual Meeting in Orlando, Florida or the June 3-4, 2014 Chemistry, Manufacturing, and Controls ("CMC") workshop in North Bethesda, Maryland on June 3 and 4, 2014.

47.    The GPhA was a trade group for participants in the generic drug industry. Recently rebranded as the Association for Accessible Medicines, the GPhA was formed in 2000 upon the merger of three other generic drug trade associations—the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

48.    Par, Mylan, Sandoz, and Accord were "Regular Members" of the GPhA. Several of Defendants' high-ranking corporate officers served on the GPhA's Board of Directors before and during the Class Period:

   a.    **2013 Board of Directors**: Don DeGolyer, President and CEO of Sandoz US,

and Tony Mauro, President of Mylan North America;

    b.  **2014 Board of Directors**: Peter Goldschmidt, President of Sandoz US; Tony Mauro, President of Mylan North America;

    c.  **2015 Board of Directors**: Peter Goldschmidt, President of Sandoz US, Marcie McClintic Coates, VP and Head of Global Regulatory Affairs for Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals;

    d.  **2016 Board of Directors**: Heather Bresch, CEO of Mylan N.V.; Peter Goldschmidt, President of Sandoz US; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals.

49.    GPhA's February and June 2014 meetings represent two of many opportunities Defendants had to collude to fix the prices of their generic amitriptyline products.

50.    Within a month after the June 2014 GPhA meeting, amitriptyline prices began significantly rising.

51.    The average price of amitriptyline increased by approximately 1,500% between July and August 2014, with certain dosages increasing as much as 2,400% over the same time period.

52.    The following graph,[2] based on National Drug Acquisition Cost data,[3] shows that Defendants abruptly increased their amitriptyline prices after the June 2014 GPhA meeting, and

---

[2] For purposes of the pricing charts below, "Endo" refers collectively to Defendants Endo International PLC, Endo Pharmaceuticals Inc., Par Pharmaceutical, Inc., and Qualitest Pharmaceuticals, Inc. and "Mylan" refers collectively to Defendants Mylan Inc. and Mylan Pharmaceuticals, Inc.

[3] NADAC is a measure of the cost of drugs developed by the National Association of State Medicaid Directors to set a single national pricing benchmark based on average drug acquisition

that since that time Defendants have continued to charge supracompetitive prices. The graph also shows that amitriptyline prices were stable before the June 2014 GPhA meeting.



53.    Defendants increased their amitriptyline prices in tandem. The following graphs detailing Medicaid reimbursements—the amount that Medicaid has paid to cover its beneficiaries' prescription drug purchases—shows prices by manufacturer and confirms that Defendants increased their prices in a coordinated fashion over time for the various dosages of amitriptyline that they sold.

costs. Draft NADAC price data is precise and accurate, according to the Centers for Medicare and Medicaid Services.

### a. **10 mg tablet – 100 count bottle**



### b. **25 mg tablet – 100 count bottle**



### c. <u>50 mg tablet – 100 count bottle</u>



### d. <u>75 mg tablet – 100 count bottle</u>



### e. <u>100 mg tablet – 100 count bottle</u>



### f. <u>150 mg tablet – 100 count bottle</u>



54.     Medicaid reimbursement rates typically correspond to the average wholesale price (AWP) minus a pre-determined percentage or the wholesale acquisition cost (WAC) plus a pre-determined percentage.  Elevated Medicaid reimbursement rates, therefore, reflect elevated AWP and/or WAC prices.  Both AWP and WAC are list prices for prescription drugs used throughout the pharmaceutical industry.  Increased WAC and AWP result in elevated retail prices paid by end-payors, such as Plaintiff and members of the proposed Classes.

55.     The Medicaid reimbursement data set forth in the above charts demonstrates that from January 2011 to mid-2014, Medicaid reimbursement rates for Defendants' amitriptyline products were at a low and declining rate, and that from mid-2014 to present, the reimbursement rates—and, therefore, list prices—substantially increased in a coordinated fashion.

56.     Accord applied for an ANDA for amitriptyline before Endo, Mylan, and Sandoz increased their amitriptyline prices.  The FDA approved Accord's amitriptyline ANDA on June 4, 2014, shortly before Defendants increased their prices.  After entering this market, as shown above, Accord priced its amitriptyline at the supracompetitive levels being set by the cartel.

**C.     There Are No Apparent Lawful Explanations for Defendants' Price Increases**

57.     There are no apparent lawful explanations for why Defendants suddenly and simultaneously raised their amitriptyline prices to artificially inflated levels.

58.     Competition in the amitriptyline market had caused prices to stabilize and remain relatively low from at least January 2011 until Defendants raised prices in summer 2014.

59.     The price increases cannot be attributed to the need to fund research and development.  Generic pharmaceutical firms do not incur the large research and development costs that brand firms absorb in developing new drugs.  Moreover, the costs associated with

developing and obtaining FDA approval for amitriptyline were incurred over 50 years ago when the drug was first introduced to the market.

60.     Nor can Defendants' price increases be attributed to a disruption in supply.  The FDA requires drug manufacturers to report potential supply interruptions, the reasons for the interruption, and the expected duration of the shortage.  Since at least January 2011, Defendants have not reported any amitriptyline-related supply disruptions to the FDA.

61.     Changes in the demand for amitriptyline also do not justify the price increases.  In 2012, amitriptyline was added to the American Geriatrics Society's Beers list of drugs that pose a high-risk of adverse effects in seniors.  Seniors taking amitriptyline risk experiencing strong anticholinergic effects, such as confusion, blurred vision, drowsiness, and hallucination.  When prescription drugs are classified as high risk, doctors tend to prescribe them to seniors less, causing total demand to decline.  Lower total demand generally causes prices to drop or stay the same if supply does not also substantially decline.  Here, however, no such drop in demand or supply can explain  the dramatic increase in amitriptyline prices.

### D.    Factors Corroborating Defendants' Horizontal Price-Fixing Agreement

62.     In addition to the facts set forth above, several other facts tend to show that Defendants acted to unlawfully raise and fix amitriptyline prices far above competitive levels. The market for amitriptyline in the United States is characterized by several factors that facilitated Defendants' conspiracy in restraint of trade, including: (1) market concentration among a limited number of participants; (2) high barriers to entry; (3) mutual interchangeability of Defendants' products; (4) inelasticity of demand and lack of available substitutes; (5) ample opportunities for Defendants' to conspire; (6) a common motive to conspire; (7) that Defendants'

conduct departed from their historic pricing practices; and (8) that unilateral price increases would have been against each Defendant's economic self-interest.

### 1.    Market Concentration

63.    Market concentration facilitates collusion among participants.  If many companies sell the same product, companies that are not part of the conspiracy can erode cartel members' market shares by offering products at lower, more competitive prices, undercutting the cartel.

64.    The market for amitriptyline is highly concentrated.  Together, Defendants Endo, Mylan, Sandoz, and Accord control nearly the entire market for amitriptyline.

65.    The absence of competing amitriptyline manufacturers has enabled Defendants, through their concerted action, to control pricing throughout the U.S. amitriptyline market.

### 2.    High Barriers to Entry

66.    Markets characterized by high barriers to entry are susceptible to anticompetitive price manipulation.

67.    High barriers to entry in the market for generic amitriptyline in the form of, among other barriers, manufacturing costs, regulatory oversight, and the need to conduct clinical testing have prevented entry by other manufacturers, even though artificially high prices would normally attract market entrants.

68.    Despite the streamlining effect of the Hatch-Waxman Act, bringing a generic drug to market remains a costly and time-consuming undertaking.  It currently takes a median of 48 months for a generic drug to be approved.  Generic drug manufacturers are required to demonstrate to the FDA with clinical test results that their drug is bioequivalent to a reference listed drug.

20

69.     Economies of scale among incumbent generic firms also make it difficult for new firms to enter a generic pharmaceutical market.  It is challenging for a non-incumbent firm to profitably produce and distribute the same drug as established firms—like Defendants—with existing manufacturing infrastructures, distribution networks, and suppliers.

### 3.     Mutual Interchangeability of Defendants' Products

70.     When products offered by different firms are viewed by purchasers as interchangeable, suppliers can more easily agree on a single price for a given product and effectively monitor pricing to enforce their agreement.  Thus, where a product is a commodity that is interchangeable with similar or identical products, incentives to form an anticompetitive cartel are particularly strong.

71.     Generic drugs are by their nature interchangeable.  In order to obtain FDA approval, each manufacturer must show that its generic drug formulation is bioequivalent to the branded drug.  In other words, the generic drug and branded drug must have the same active ingredient and perform in the same manner, and each generic drug will, as a consequence, also have the same active ingredients and perform in the same manner.  The amitriptyline products manufactured by Defendants are chemical compounds composed of the same raw materials.  As such, the amitriptyline products manufactured by Defendants are interchangeable and reasonable substitutes for one another.

### 4.     Inelastic Demand

72.     Where demand for a product is inelastic, increases in price cause only limited declines in the quantity of the product sold or consumed in the market.  Thus, if a given change in price triggers a proportionately smaller change in the quantity of product demanded in the market, then demand for the product is said to be inelastic.

21

73.     For a cartel to profit from raising prices above competitive levels, demand must be inelastic such that cartel members are able to raise prices without triggering a decline in demand that would render the concerted price increase unprofitable.  Demand is most likely to be inelastic where a product is necessary and cannot be reasonably substituted by another product. Both of these conditions are met with respect to amitriptyline.

74.     Amitriptyline is an important and medically necessary drug for millions of people. Left untreated, symptoms of clinical depression and chronic pain treated by amitriptyline can rapidly worsen, delaying or impeding recovery for those with serious health conditions.  The result in such circumstances is often drug or alcohol dependency, chronic lack of sleep, and/or failing personal relationships and professional performance.  Doctors and their patients therefore regard amitriptyline as a medical necessity that must be purchased without regard to an increase in price.

75.     Amitriptyline appears on the World Health Organization's list of "Essential Medicines."  While other tricyclic antidepressants on the market seek to treat similar conditions, amitriptyline is often the only effective medicine that is reasonably available or medically suitable to patients in need.

76.     Amitriptyline is also differentiated from other drug products because of its regulatory status.  A generic drug is considered a therapeutic equivalent of—and AB-rated with respect to—the brand-name version and other generic versions of that drug.  Defendants' amitriptyline products are not therapeutically equivalent to—or AB-rated with respect to—other drug products, even similar ones.  Thus, a patient prescribed amitriptyline could not purchase a different drug using his or her amitriptyline prescription, regardless of the respective prices of the drugs.

77.     Because of the inelastic demand for amitriptyline, the market for amitriptyline is susceptible to price collusion as price increases will directly translate into more, not less, revenue and profits for cartel members.

### 5.     Opportunities to Conspire

78.     As described above, Defendants were members of GPhA during the relevant time period.  Endo, Sandoz, and Mylan attended GPhA's Annual Meeting held from February 19-21, 2014 in Orlando, Florida.  Mylan, Sandoz, and Accord also attended GPhA's CMC Workshop in North Bethesda, Maryland from June 3-4, 2014.

79.     GPhA represented that its "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."  GPhA stated that it "provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."

80.     Defendants attended the following GPhA meetings, providing them with opportunities to conspire regarding their amitriptyline prices:

| Event | Attendees |
|---|---|
| 2013 GPhA Annual Meeting<br><br>February 20-22, 2013<br>Orlando, Florida | • Accord<br>• Endo<br>• Mylan<br>• Par<br>• Qualitest<br>• Sandoz |
| 2013 GPhA CMC Workshop<br><br>June 4-5, 2013<br>Bethesda, Maryland | • Accord<br>• Endo<br>• Mylan<br>• Par<br>• Qualitest<br>• Sandoz |

| 2013 GPhA Fall Technical Conference<br><br>October 28-30, 2013<br>Bethesda, Maryland | • Endo<br>• Mylan<br>• Par<br>• Qualitest<br>• Sandoz |
|---|---|
| 2014 GPhA Annual Meeting<br><br>February 19-21, 2014<br>Orlando, Florida | • Endo Pharmaceuticals<br>• Mylan<br>• Par<br>• Qualitest<br>• Sandoz |
| 2014 GPhA CMC Workshop<br><br>North Bethesda, Maryland<br>June 3-4, 2014 | • Accord<br>• Mylan<br>• Par<br>• Qualitest<br>• Sandoz |
| 2014 GPhA Fall Technical Conference<br><br>October 27-29, 2014 North Bethesda, Maryland | • Accord<br>• Mylan<br>• Par<br>• Qualitest<br>• Sandoz |

81.    Defendants Sandoz, Endo, and Accord attended the Efficient Collaborative Retail Marketing's ("ECRM") Generic Pharmaceuticals Efficient Program Planning Session—a meeting to put Defendants and other generic pharmaceutical suppliers in touch with their buyers—from February 23-26, 2014 in Amelia Island, Florida.  According to ECRM, the Efficient Program Planning Sessions are "made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow incremental sales and uncover industry trends."

82.    In addition to GPhA and ECRM, Defendants belong to other pharmaceutical trade groups, such as the National Association of Chain Drug Stores (NACDS).  NACDS's mission "is

to advance the interests and objectives of the chain community pharmacy industry by fostering its growth and promoting its role as a provider of healthcare services and consumer products."

83.     Membership in NACDS is open to generic pharmaceutical manufacturers; members may participate in NACDS committees and workgroups, and attend various conferences.  Endo, Par, Mylan, Sandoz, and Accord were all NACDS members from 2012 through 2016.

84.     On April 20-23, 2013, NACDS held its Annual Meeting in Palm Beach, Florida. NACDS describes the Annual Meeting as "the industry's most prestigious gathering of its most influential leaders," and a "classic 'Top-to-Top' business conference" attended by "senior management" in the pharmaceutical retailing and manufacturing industries.  Attendees are furnished a list of participating companies in advance, have access to private meeting rooms where executives can meet in person, and can attend a variety of business programs, "invitation only" events, and social functions.

85.     Defendants' high-ranking corporate officers, including the individuals mentioned below, attended NACDS's 2013 Annual Meeting:

 a.  **Accord:** Myrl Vossler, Senior Vice President, Commercial Operations;

 b.  **Endo:** Brent Bumpas, National Account Director for Trade; and Scott Littlefield, Trade Director;

 c.  **Mylan:** Joe Duda, President; Tony Mauro, Chief Commercial Officer; Robert Potter, Senior VP, North America National Accounts and Channel Development; Jeffrey May, VP of North America Product Strategy; and Jim Nesta, VP of Sales;

    d. **Par:** Paul Campanelli, President; Jon Holden, VP of Sales; Michael Altamuro, VP of Marketing and Business Analytics; and Renee Kenney, Senior VP, Generic Sales;

    e. **Sandoz:** Donald DeGolyer, CEO and Director; Jeff George, Global Head of Sandoz; Richard Tremonte, Senior VP, Global Generic Pharmaceuticals.

86.    The next year, executives, senior management, and salespeople from Endo, Par, Mylan, Sandoz, and Accord attended the NACDS 2014 Annual Meeting from April 26-29 at The Phoenician resort in Scottsdale, Arizona.  This meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

    a. **Accord:** Gerry Price, President; and Myrl Vossler, Senior Vice President, Commercial Operations;

    b. **Endo:** Brent Bumpas, National Account Director for Trade; and Scott Littlefield, Trade Director;

    c. **Mylan:** Mylan: Joe Duda, President; Hal Korman, Executive VP and Chief Operating Officer; Tony Mauro, Chief Commercial Officer; John Munson, VP of Global Accounts; Robert Potter, Senior VP of North America National Accounts and Channel Development; Rob O'Neill, Head of Sales Generic North America; and Jim Nesta, VP of Sales;

    d. **Par:** Paul Campanelli, President; Antonio Pera, Chief Commercial Officer; Jon Holden, VP of Sales; Michael Altamuro, VP of Marketing and Business Analytics; and Renee Kenney, Senior VP, Generic Sales;

    e. **Sandoz:** Peter Goldschmidt, President of Sandoz US and Head, North America; Steven Greenstein, Director for Key Customers; Anuj Hasija, Executive Director

for Key Customers; Armondo Kellum, VP of Sales and Marketing; Kirko Kirkov,

Executive Director, Key Customers; Scott Smith, VP Sales and Marketing

87.     Executives, senior management, and salespeople from Endo, Par, Mylan, Sandoz,

and Accord also attended the NACDS Annual Meetings for 2015 and 2016—both events took

place in April at The Breakers resort in Palm Beach, Florida.

88.     In addition to its Annual Meeting, the NACDS hosts its annual "Total Store

Expo," which the NACDS website touts as "the industry's largest gathering of its most

influential leaders.  It is a combination of both strategic and tactical business meetings between

existing and new trading partners and is attended by industry decision makers."

89.     On August 10-13, 2013, the NACDS held its Total Store Expo at the Sands Expo

Convention Center in Las Vegas, Nevada.  The following representatives of Defendants, among

others, attended:

  a.  **Accord:** Kamesh Venugopal, President; Myrl Vossler, Senior Vice President,

      Commercial Operations; Nelesh Ambre, Director of National Accounts; and

      James Horan, Director of National Accounts;

  b.  **Endo:** Brent Bumpas, National Account Director for Trade; Kevin O'Brien,

      Senior Director of Payer Markets; and Scott Littlefield, Trade Director;

  c.  **Mylan:** Joe Duda, President; Tony Mauro, Chief Commercial Officer; Matt

      Cestra, Senior Director of Marketing; Martin Fletcher, Senior Director of

      Commercial Business and Purchasing; Rodney Emerson, Director of Pricing and

      Contracts; Kevin McElfresh, Executive Director of National Accounts; Mike

      Aigner, Director of National Accounts; Edgar Escoto, Director of National

      Accounts; Lance Wyatt, Director of National Accounts; John Baranick, Director

27

of Trade Relations; Robert Potter, Senior VP, North American National Accounts and Channel Development; Heather Paton, VP of Sales for Mylan Institutional; Jeffrey May, VP of North America Product Strategy; Jim Nesta, VP of Sales; and Rob O'Neill, Head of Generic Sales;

d. **Par:** Paul Campanelli, President; Gerald Burton, VP of National Accounts; Karen O'Connor, VP of National Accounts; Rick Guillory, VP of National Accounts; Jon Holden, VP of Sales; Michael Altamuro, VP of Marketing and Business Analytics; Christine Caronna, Director of National Accounts; and Renee Kenney, Senior VP, Generic Sales;

e. **Qualitest:** Sandra Bayer, Senior Director of National Accounts; Kelly Bachmeier, Director of National Accounts; Walter Busbee, Director of National Accounts; Jeremy Tatum, Director of Market Insights; Lori Minnihan, Associate Director of Trade Pricing Operations; Warren Pefley, VP of Sales and Marketing; Michael Reiney, VP of Purchasing; and Charles Propst, VP;

f. **Sandoz:** Peter Goldschmidt, President of Sandoz US and Head, North America; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Armando Kellum, VP of Sales and Marketing; Paul Krauthauser, Senior VP of Sales and Marketing; and Della Lubke, National Account Executive.

90.    On August 23-26, 2014, the NACDS held its Total Store Expo at the Boston Convention Center in Massachusetts.  In attendance were the following representatives of Defendants, among others:

a. **Accord:** Gerry Price, President; Myrl Vossler, Senior Vice President, Commercial Operations; Tina Crider, Executive Director of National Accounts;

Nelesh Ambre, Director of National Accounts; James Horan, Director of National Accounts; and Judith Schofield, Director of National Accounts;

b. **Endo:** Brent Bumpas, National Account Director for Trade; Kevin O'Brien, Senior Director of Payer Markets; and Scott Littlefield, Trade Director;

c. **Mylan:** Joe Duda, President; Tony Mauro, Chief Commercial Officer; Michael Scouvart, Head of North America Marketing; Kevin McElfresh, Executive Director of National Accounts; Mike Aigner, Director of National Accounts; Edgar Escoto, Director of National Accounts; Gary Tighe, Director of National Accounts; Lance Wyatt, Director of National Accounts; John Baranick, Director of Trade Relations; Rameshwan Bhavsar, Manager of Managed Markets Marketing; Robert Potter, Senior VP, North American National Accounts and Channel Development; Heather Paton, VP of Sales for Mylan Institutional; and Jim Nesta, VP of Sales;

d. **Par:** Antonio Pera, Chief Commercial Officer; Gerald Burton, VP of National Accounts; Karen O'Connor, VP of National Accounts; Rick Guillory, VP of National Accounts; Jon Holden, VP of Sales; Michael Altamuro, VP of Marketing and Business Analytics; Christine Caronna, Director of National Accounts; and Renee Kenney, Senior VP, Generic Sales;

e. **Qualitest:** Sandra Bayer, Senior Director of National Accounts; Kelly Bachmeier, Director of National Accounts; Walter Busbee, Director of National Accounts; Darren Hall, Director of National Accounts; Jeremy Tatum, Director of Market Insights; Lori Minnihan, Associate Director of Trade Pricing Operations; Warren

Pefley, VP of Sales and Marketing; Michael Reiney, VP of Purchasing; and

Charles Propst, VP;

f.  **Sandoz:** Lisa Badura, Director, Key Customers; Christopher Bihari, Director,

Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija,

Executive Director Key Customers; Armondo Kellum, Vice President, Sales and

Marketing; Della Lubke, National Account Executive; Scott Smith, VP of Sales

and Marketing; Arunesh Verma, Executive Director, Marketing; Sean Walsh,

Director, Key Customers;

91.    Executives, senior management, and salespeople from Endo, Par, Qualitest,

Mylan, Sandoz, and Accord also attended the NACDS Total Store Expo on August 22-25, 2015

at the Colorado Convention Center in Denver.

92.    In addition to providing Defendants with an opportunity to share information

about the generic pharmaceutical business, these trade association events included social

activities such as theater performances, cocktail parties, and dinners, which enabled Defendants'

executives to interact with their competitors privately and outside the typical business setting.

93.    As a consequence of their participation in trade associations such as GPhA,

NACDS, and ECRM, and their attendance at the trade association events referenced above,

Defendants had ample opportunity to devise and implement their anticompetitive scheme to

raise, fix, and maintain the price of generic amitriptyline.

### 6.    <u>Common Motive</u>

94.    Before implementing the price increases described herein, Defendants faced a

market characterized by low amitriptyline prices, as well as an overall trend of declining generic

drug prices.  As a result, Defendants were highly motivated to identify generic drugs in markets particularly susceptible to collusion, and to agree to increase the prices of those drugs.

95.    Generic drug prices for Medicare Part D fell 59% between 2010 and the second quarter of 2015.  These declines in generic drug prices had a negative impact on Defendants' revenues.

96.    The desire to regain revenues lost to falling generic drug prices provided Defendants with a motive to conspire.  As Richard Evans at Sector & Sovereign Research stated: "[a] plausible explanation is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics— low [revenues] due to either very low prices or very low volumes—accommodate price inflation."  Defendants were motivated to act collectively, instead of individually, because any single Defendant unilaterally implementing a price increase would have encountered a drop in sales offsetting that Defendant's price increase.

### 7.    Defendants' Price Increases Represented a Departure from Their Historic Pricing Practices

97.    Absent collusion or some alternate explanation, prices within a market generally fall as a result of competition and eventually stabilize at a low, profitable price.  The amitriptyline market was no exception before Defendants implemented their price-fixing agreement.  As illustrated above, after decades of competition, amitriptyline prices remained stable at relatively low levels since at least January 2011.  Defendants' summer 2014 price increases departed from the stable amitriptyline pricing of prior years and from ordinary pricing practices, and are indicative of collusion.

**8.    Absent an Anticompetitive Conspiracy, Amitriptyline Price Increases Would Have Run Contrary to Each Defendant's Self-Interest**

98.    Because amitriptyline is a commodity product, absent a cartel, it would be expected that any manufacturer that raised the price of the drug would lose customers to manufacturers that did not raise prices.  Consequently, it would not be in any manufacturer's self-interest to raise the price of amitriptyline unless an agreement existed with other manufacturers to raise prices.

99.    The risk of losing market share as a result of unilateral price increases is particularly acute with respect to commodity products like amitriptyline, because the only material difference among commodity products sold by different companies is price.  In preparing its generic drug pricing report, the U.S. Government Accountability Office interviewed representatives from five generic manufacturers, including Defendants Mylan and Sandoz.  The manufacturers acknowledged that a competitive generic market "operates like a commodities market" and that "they are asked to submit a proposal offering their best possible price to their customers—for example, companies that operate pharmacies or wholesalers.  If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer."  As the generic manufacturers noted, these factors create a "competitive threat that serves as an incentive to keep prices low."  Absent collusion, increasing prices in a competitive environment that fostered incentives to keep prices low would have gone against each Defendant's self-interest.

100.    During the Class Period, the cost of manufacturing amitriptyline remained stable, as did supply and demand.  Still, each Defendant raised the prices of amitriptyline by extraordinary margins.  But for the existence of an anticompetitive cartel, these price increases would have undermined the economic interests of each Defendant.

32

E.    **Current Federal and State Antitrust Actions Regarding Anticompetitive Practices in the Generic Pharmaceutical Industry**

101.    Recent drastic price increases in the generic pharmaceutical industry have triggered several governmental investigations by federal and state antitrust regulators.  Multiple congressional investigations were also launched.

102.    In 2014 testimony before the Subcommittee on Primary Health and Aging, pharmaceutical industry experts testified that generic drug prices were not following traditional pricing patterns and were instead experiencing very substantial increases.

103.    In February 2015, Senator Bernie Sanders and Representative Elijah Cummings wrote the Department of Health and Human Services Inspector General to request that it investigate recent increases in the prices being charged for a number of generic drugs, including amitriptyline.

104.    In April 2015, the HHS Office of Inspector General initiated an investigation into the sudden price increases implemented by generic drug manufacturers.

105.    According to the December 2015 report prepared by the HHS Office of Inspector General, the price of nearly one in four of the top 200 generic drugs rose faster than the price of inflation between 2005 and 2014.

106.    An August 2016 Government Accountability Office report to members of Congress found that more than 300 generic drugs under Medicare Part D—including amitriptyline—experienced "extraordinary" price increases of more than one hundred percent, and that the prices for most of these medicines remained excessively high for at least a year.

107.    Appendix III of the August 2016 GAO report lists several dosages of amitriptyline tablets as having experienced "an extraordinary price increase" from 2014 to 2015.

108.    Over the past year the DOJ's Antitrust Division has issued subpoenas to a number of generic drug manufacturers.  Among the manufacturers subpoenaed were Defendant Mylan and Defendant Par Pharmaceutical Holdings, a subsidiary of Defendant Endo.

109.    The State of Connecticut Office of Attorney General has led its own investigation, which remains ongoing and has already resulted in a 40-state complaint charging several generic pharmaceutical manufacturers—including Defendant Mylan—with antitrust violations.  The complaint states that the "the Plaintiff States have uncovered wide-ranging conduct implicating numerous different drugs and competitors, which will be acted upon at the appropriate time." The complaint also lays out Mylan's role in the conspiracy and Mylan's regular communications with other would-be competitors to fix prices as early as 2013.

110.    In connection with its antitrust investigation, the State of Connecticut Office of Attorney General issued a subpoena and interrogatories to Defendant Endo Pharmaceuticals, Inc., specifically related to the pricing and sale of its amitriptyline products and its related communications with would-be competitors.

## VII.    EFFECTS ON COMPETITION, AND DAMAGES

111.    Defendants' combination and conspiracy as set forth in this complaint has had the following effects, among others:

- Competition in the market for amitriptyline has been substantially reduced;

- Prices for amitriptyline have increased, and run contrary to the typical pricing patterns of generic drugs;

- United States purchasers have been deprived of the benefit of free and open price competition in the market for amitriptyline; and

- As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and the Classes of end-payors have been injured in their business and property in that they paid artificially inflated prices for amitriptyline during the Class Period.

112.    Plaintiff and the proposed Classes have been damaged as measured by the full amount of the overcharges that they paid in an amount subject to proof and to be determined at trial.

113.    The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## VIII.   ANTITRUST IMPACT

114.    Supracompetitive prices upstream in the chain of distribution ordinarily result in higher prices at every level below.  That is true here as well.

115.    The overcharges resulting from defendants' conduct are directly traceable through the pharmaceutical distribution chain to end-payors.  A manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts.  Wholesalers then sell the drug to pharmacies, which sell the drugs to consumers.

116.    In this small chain of distribution, drugs products are not altered or incorporated into other products.  And unlike other industries, each drug purchase is documented and closely tracked by pharmacies, pharmacy benefit managers, and other entities.  The products—and their price—are thus directly traceable from the manufacturer until they reach the hands of the consumer at a pharmacy.

117.    Defendants' price increases directly impact both consumer and third-party payor Class members.  When a consumer purchases a drug at a pharmacy, the amount of the price paid by the consumer and the amount paid by a third-party payor (such as health and welfare funds) are determined according the consumers' prescription drug plan.  In many transactions, the consumer will pay a percentage of the cost of the drug (*e.g.* 10% or 20%), with the third-party payor paying the remainder of the cost.  As a result, when the price of a drug increases, the

increase is borne by both the consumer and third-party payor. As the GAO Report explained, "[g]eneric drugs not only lower costs for individuals in the form of lower copayments and other out-of-pocket costs, but they also lower costs for third-party payers—including private health insurance plans and public programs."

118.    Defendants' anticompetitive conduct has thus resulted in both consumers and third-party payors purchasing amitriptyline at prices that exceeded the prices defendants would have been able to charge absent their anticompetitive conduct.

119.    Defendants continue to charge supracompetitive prices for their amitriptyline products. But-for Defendants' price increases and maintenance of supracompetitive prices, they would have priced their amitriptyline products substantially lower than they did.

## IX.    **CLASS ACTION ALLEGATIONS**

120.    Plaintiff brings this action on behalf of itself and, under Federal Rules of Civil Procedure 23(a) and (b)(2) as a representative of a Class seeking equitable and injunctive relief (the "Injunctive Relief Class") defined as follows:

> All persons or entities in the United States and its territories who purchased, paid and/or provided reimbursement for some or all of the purchase price for amitriptyline manufactured by Defendants and/or their affiliates for consumption by themselves or their families, members, employees, insureds, plan participants, or beneficiaries other than for resale at any time during the period June 3, 2014, through the present.

121.    Plaintiff also brings this action on behalf of itself and, under Federal Rules of Civil Procedure 23(a) and (b)(3), as representative of a Class seeking damages and other relief pursuant to the state antitrust, unfair competition, and consumer protection laws of the states listed below (the "Damages Class") defined as follows:

> All persons or entities in the United States and its territories who paid and/or provided reimbursement for some or all of the

36

purchase price for amitriptyline manufactured by Defendants and/or their affiliates purchased in Arizona, California, Florida, Georgia, Hawaii, Illinois, Indiana, Kansas, Massachusetts, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio Pennsylvania, South Carolina, Texas, and Vermont, for consumption by themselves or their families, members, employees, insureds, plan participants, or beneficiaries other than for resale at any time during the period June 3, 2014 through the present.

122.   The Injunctive Relief Class and Damages Class are collectively referred to as the

Classes.  The following persons or entities are excluded from the Classes:

- Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

- All federal or state governmental entities, excluding cities, towns, or municipalities with self-funded prescription drug plans;

- All persons or entities who purchased amitriptyline for purposes of resale directly from Defendants and their affiliates;

- Fully insured health plans, *i.e*, plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members;

- Any "flat co-pay" consumers whose purchases were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price;

- Pharmacy Benefits Managers; and

- All judges assigned to this case and any members of their immediate families.

123.   The Class members are so numerous that joinder is impracticable.  Members of

the proposed Classes are widely dispersed throughout the country.  The Classes include at least

hundreds of thousands of consumers and at least thousands of third-party payors.

124.   Plaintiff's claims are typical of the claims of all Class members.  Plaintiff and all

Class members were damaged by the same wrongful conduct by Defendants, *i.e.*, they paid

artificially inflated prices for amitriptyline, and were deprived of the benefits of competition because of Defendants' wrongful conduct.

125.    Plaintiff will fairly and adequately protect and represent the interests of the proposed Classes.  Plaintiff's interests are coincident with, and not antagonistic to, those of the proposed Classes.

126.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, and who have particular expertise with class action antitrust litigation in the pharmaceutical industry.

127.    Questions of law and fact common to the Class members predominate over any questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to all members of the proposed Classes.

128.    Questions of law and fact common to the Classes include:

- whether Defendants violated sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3;

- whether Defendants' combination, conspiracy, or agreement constitutes a violation of the state laws set forth below;

- whether Defendants conspired to and did suppress competition in the market for amitriptyline;

- whether Defendants' challenged conduct harmed competition in the amitriptyline market;

- whether, and to what extent, Defendants' conduct as alleged herein caused antitrust injury to the business or property of Plaintiff and Class members in the form of overcharges;

- the quantum of aggregate overcharge damages paid by the Classes; and

- whether Plaintiff and Class members are entitled to injunctive relief to prevent further violation of sections 1 and 3 of the Sherman Act.

129.    Class treatment is a superior method for the fair and efficient adjudication of the controversy. Class treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

130.    Class treatment also is appropriate under Rule 23(b)(1) and/or (b)(2) because:

the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants;

•    the prosecution of separate actions by individual Class members would create a risk of adjudication of their rights that, as a practical matter, would be dispositive of the interests of other Class members not parties to such adjudications or would substantially impair or impede other Class members' ability to protect their interests; and

•    Defendants have acted and refused to act on grounds that apply generally to the Classes such that final injunctive relief and/or declaratory relief is warranted with respect to the Classes as a whole.

131.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## X.    CLAIMS FOR RELIEF

### CLAIM I
### Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (Asserted against all Defendants)

132.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

133.    This claim is pled as to all Defendants and is brought by Plaintiff on behalf of itself and members of the Injunctive Relief Class.

134.    Beginning at least as early as June 3, 2014, the exact dates being unknown to Plaintiff and the Class and exclusively within Defendants' knowledge, Defendants, acting in concert, entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially eliminating or reducing competition in the pricing of amitriptyline in the United States.

135.    Defendants combined and conspired to raise, fix, maintain or stabilize the prices of amitriptyline in the United States during the Class Period.

136.    As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their horizontal price-fixing conspiracy, prices for amitriptyline sold to purchasers in the United States during the Class Period were raised, fixed, maintained or stabilized at artificially inflated levels.

137.    The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

138.    For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain, and/or stabilize the prices of amitriptyline. Such activities included: (a) participating in meetings to discuss their respective amitriptyline prices and how they could coordinate their market behavior to restrain trade with regard to their generic drug products; (b) agreeing to coordinate and manipulate the prices and available supply of amitriptyline in a manner that deprived United States purchasers of free and open price

competition; and (c) providing pretextual justifications to purchasers and the public to explain the changes in the prices for Defendants' amitriptyline.

139.     Defendants' concerted anticompetitive acts are illegal per se.

140.     As a direct and proximate result of Defendants' illegal anticompetitive conduct, Plaintiff and the Injunctive Relief Class have been injured in their business and property in that they have paid more for the amitriptyline that they purchased during the Class Period than they otherwise would have paid absent Defendants' wrongful conduct.

141.     By reason of the foregoing, Plaintiff and the Injunctive Relief Class are entitled to injunctive relief and a reasonable attorney's fee pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## CLAIM II
### Violations of Section 3 of the Sherman Act, 15 U.S.C. § 3
### (Asserted against all Defendants)

142.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

143.     This claim is pled as to all Defendants and is brought by Plaintiff on behalf of itself and members of the proposed Injunctive Relief Class.

144.     Beginning at least as early as June 3, 2014, the exact dates being unknown to Plaintiff and the Class and exclusively within Defendants' knowledge, Defendants, acting in concert, entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of section 3 of the Sherman Act, 15 U.S.C. § 3, by artificially eliminating or reducing competition for the pricing of amitriptyline in any state or territory of the United States or in the District of Columbia.

145.    Defendants combined and conspired to raise, fix, maintain or stabilize the prices of amitriptyline in any state or territory of the United States or in the District of Columbia during the Class Period.

146.    As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their horizontal price-fixing conspiracy, prices for amitriptyline sold to purchasers in any state or territory of the United States or in the District of Columbia during the Class Period were raised, fixed, maintained or stabilized at artificially inflated levels.

147.    The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

148.    For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain, and/or stabilize the prices of amitriptyline. Such activities included: (a) participating in meetings to discuss their respective amitriptyline prices and how they could coordinate their market behavior to restrain trade with regard to their generic drug products; (b) agreeing to coordinate and manipulate the prices and available supply of amitriptyline in a manner that deprived United States purchasers of free and open price competition; and (c) providing pretextual justifications to purchasers and the public to explain the changes in the prices for Defendants' amitriptyline.

149.    Defendants' concerted anticompetitive acts are illegal per se.

150.    As a direct and proximate result of Defendants' illegal anticompetitive conduct, Plaintiff and the Injunctive Relief Class have been injured in their business and property in that they have paid more for the amitriptyline that they purchased during the Class Period than they otherwise would have paid absent Defendants' wrongful conduct.

151.    By reason of the foregoing, Plaintiff and the Injunctive Relief Class are entitled to injunctive relief and a reasonable attorney's fee pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## CLAIM III
### Conspiracy and Combination in Restraint of Trade in Violation of State Laws
### (Asserted against all Defendants)

152.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

153.    This claim is pled as to all Defendants and is brought by Plaintiff on behalf of itself and members of the proposed Damages Class.

154.    Beginning at least as early as June 3, 2014, the exact dates being unknown to Plaintiff and the Class and exclusively within Defendants' knowledge, Defendants, acting in concert, entered into a continuing combination, conspiracy or agreement to unreasonably restrain trade and commerce in restraint of trade, the purpose and effect of which was to fix, raise, maintain or stabilize the price of amitriptyline.

155.    Defendants implemented the terms of their combination, conspiracy, or agreement and achieved their intended purpose.  As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff and the Damages Class were harmed as set forth above.

156.    Defendants' unlawful horizontal combination, conspiracy or agreement harmed competition in the market for amitriptyline.

157.    There was and is no legitimate or non-pretextual procompetitive justification for Defendants' coordinated price increases that outweigh their harmful effect.  Even if there were

some conceivable justification, the coordinated price increases were not necessary to achieve that purpose.

158.    By engaging in the foregoing conduct, Defendants entered a conspiracy and combination in restraint of trade in violation of the following state laws:

- Ariz. Rev. Stat. § 44-1402, *et seq.*, with respect to purchases in Arizona by Class members and/or purchases by Arizona residents.

- Cal. Bus. & Prof. Code § 16720, *et seq.*, with respect to purchases in California by Class members and/or purchases by California residents.

- D.C. Code § 28-4501, *et seq.*, with respect to purchases in the District of Columbia by Class members and/or purchases by District of Columbia residents.

- Haw. Rev. Stat. § 480-1, *et seq.*, with respect to purchases in Hawaii by Class members and/or purchases by Hawaii residents.

- Iowa Code § 553.1, *et seq.*, with respect to purchases in Iowa by Class members and/or purchases by Iowa residents.

- Kan. Stat. Ann. § 50-101, *et seq.*, with respect to purchases in Kansas by Class members and/or purchases by Kansas residents.

- Me. Rev. Stat. Ann. 10 § 1101, *et seq.*, with respect to purchases in Maine by Class members and/or purchases by Maine residents.

- Mich. Comp. Laws § 445.771, *et seq.*, with respect to purchases in Michigan by Class members and/or purchases by Michigan residents.

- Minn. Stat. § 325D.51, *et seq.*, with respect to purchases in Minnesota by Class members and/or purchases by Minnesota residents.

- Miss. Code § 75-21-1, *et seq.*, with respect to purchases in Mississippi by Class members and/or purchases by Mississippi residents.

- Neb. Rev. Stat. § 59-801, *et seq.*, with respect to purchases in Nebraska by Class members and/or purchases by Nebraska residents.

- Nev. Rev. Stat. Ann. § 598A.060, *et seq.*, with respect to purchases in Nevada by Class members and/or purchases by Nevada residents, in that thousands of sales of amitriptyline occurred at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

- N.H. Rev. Stat. Ann. § 356:2, *et seq.*, with respect to purchases in New Hampshire by Class members and/or purchases by New Hampshire residents.

- N.M. Stat. Ann. § 57-1-1, *et seq.*, with respect to purchases in New Mexico by Class members and/or purchases by New Mexico residents.

- New York General Business Law § 340, *et seq.*, with respect to purchases in New York by Class members and/or purchases by New York residents.

- N.C. Gen. Stat. § 75-1, *et seq.*, with respect to purchases in North Carolina by Class members and/or purchases by North Carolina residents.

- N.D. Cent. Code § 51-08.1-02, *et seq.*, with respect to purchases in North Carolina by Class members and/or purchases by North Dakota residents.

- Rhode Island Gen. Laws § 6-36-1, *et seq.* with respect to purchases in Rhode Island by Class members and/or purchases by Rhode Island residents

- S.D. Codified Laws Ann. § 37-1-3.1, *et seq.*, with respect to purchases in South Dakota by Class members and/or purchases by South Dakota residents.

- Tenn. Code Ann. § 47-25-101, *et seq.*, with respect to purchases in Tennessee by Class members and/or purchases by Tennessee residents, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for amitriptyline at Tennessee pharmacies.

- W. Va. Code § 47-18-3, *et seq.*, with respect to purchases in West Virginia by Class members and/or purchases by West Virginia residents.

- Wis. Stat. § 133.03, *et seq.*, with respect to purchases of amitriptyline in Wisconsin by Class members and/or purchases by Wisconsin residents, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher prices for amitriptyline at Wisconsin pharmacies.

159.    Plaintiff and Damages Class members have been and will continue to be injured in their business or property by reason of Defendants' violations of the laws set forth above, in that Plaintiff and Class members (i) were denied the opportunity to purchase more affordable amitriptyline, and (ii) paid higher prices for amitriptyline than they would have paid but for Defendants' unlawful conduct.  Such injuries are of the type that the aforementioned laws were intended to prevent and flow from that which makes Defendants' acts unlawful.

45

160.    Plaintiff and the Damages Class are entitled to actual and trebled damages as permitted by law.

**CLAIM IV**
**Violations of State Consumer Protection Statutes**
**(Asserted against all Defendants)**

161.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

162.    This claim is pled as to all Defendants and is brought by Plaintiff on behalf of itself and members of the proposed Damages Class.

163.    Beginning at least as early as June 3, 2014, the exact dates being unknown to Plaintiff and the Class and exclusively within Defendants' knowledge, Defendants, acting in concert, engaged in unfair methods of competition, and unfair and unconscionable acts or practices in the course of trade, with respect to the sale of amitriptyline in violation of the following state consumer protection and unfair competition statutes:

- Cal. Bus. & Prof. Code § 17200, *et seq.*;

- D.C. Code Ann. § 28-3901, *et seq.*;

- Fla. Stat. § 501.201, *et seq.*;

- Haw. Rev. Stat. § 480-2, *et seq.*;

- Kan. Stat. Ann. § 50-623, *et seq.*;

- Mich. Comp. Laws § 445.901, *et seq.*;

- Miss. Code § 75-24-1, *et seq.*;

- Neb. Rev. Stat. § 59-1601, *et seq.*;

- N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*;

- N.M. Stat. Ann. § 57-12-1, *et seq.*;

- N.C. Gen. Stat. § 75-1.1, *et seq.*; and

- Rhode Island Gen. Laws § 6-13.1-1, *et seq.*

164. Defendants agreed to, and did, act unfairly in restraint of commerce by affecting, fixing, controlling and/or maintaining, at artificial and supracompetitive levels, the prices at which amitriptyline was sold, distributed, or obtained and made efforts to conceal their agreements from Plaintiff and the Class.

165. Defendants' intentional anticompetitive acts, described above, were intended to and did cause Plaintiff and/or Damages Class members to pay supracompetitive prices for amitriptyline in the states listed above.

166. All of Defendants' unlawful and unfair conduct occurred in the course of their business and was part of a generalized course of conduct.

167. As a direct and proximate result of the Defendants' unfair methods of competition and unfair and unconscionable trade practices, Plaintiff and the Damages Class have been injured in their business and property in that they paid more for amitriptyline than they otherwise would have paid in the absence of Defendants' unlawful and unfair conduct.

168. Plaintiff and the Damages Class are therefore entitled to appropriate relief as provided for by the laws of the states set forth above, including but not limited to damages, injunctive relief, reasonable attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits Defendants obtained by reason of their unlawful and unfair conduct.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes, respectfully requests that the Court:

A.    Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action be given to the Class consistent with Federal Rule of Civil Procedure 23(c)(2), and designate Plaintiff as the representative of the Classes;

B.    Enter joint and several judgments against Defendants and in favor of Plaintiff and the Classes;

C.    Award the Damages Class damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

D.    Grant Plaintiff and the Classes equitable relief in the form of restitution, disgorgement, and establishment of a constructive trust to remedy Defendants' illegal conduct, including:

    i.    A judicial determination declaring the rights of Plaintiff and Class members and the corresponding responsibilities of Defendants;

    ii.    A declaration that Defendants are to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class members;

    iii.    Disgorgement and/or the imposition of a constructive trust upon Defendants' ill-gotten gains, thereby freezing Defendants' assets, and/or requiring Defendants to pay restitution to Plaintiff and Class members of all funds acquired by means of any act or practice declared by this Court to violate federal or state statutes or to constitute unfair methods of competition or unfair or unconscionable acts or practices in the course of trade.

E.    Award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided for by law.

## XII.  **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of itself and the

Classes, demands a trial by jury on all issues so triable.


Dated: March 31, 2017                              Respectfully Submitted

                                                   **SAFIRSTEIN METCALF LLP**

                                                   By:  ___/s/ *Peter Safirstein*___

                                                   Peter Safirstein
                                                   Elizabeth Metcalf
                                                   1250 Broadway, 27th Floor
                                                   New York, NY 10001
                                                   Telephone:  (212) 201-2845
                                                   Email: psafirstein@safirsteinmetcalf.com
                                                          emetcalf@safirsteinmetcalf.com

                                                   **GIRARD GIBBS LLP**
                                                   Daniel C. Girard (*pro hac* pending)
                                                   Dena C. Sharp (*pro hac* pending)
                                                   Jordan Elias (*pro hac* pending)
                                                   Adam E. Polk (*pro hac* pending)
                                                   601 California Street, Suite 1400
                                                   San Francisco, CA 94108
                                                   Telephone:  (415) 981-4800
                                                   Facsimile:  (415) 981-4846
                                                   Email: dcg@girardgibbs.com

                                                   *Attorneys for Plaintiff*